IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| BOBBY JANE WILSON, ) | CIVIL ACTION NO. 9:16-2213-CMC-BM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein she was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a), (D.S.C.).

Plaintiff applied for Supplemental Security Income (SSI) on March 21, 2012 (protective filing date), alleging disability beginning March 21, 2012 (amended date), due to chronic obstructive pulmonary disease (COPD), diabetes, high blood pressure, and arthritis. (R.pp. 23, 179, 202). Plaintiff claim was denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on September 10, 2014. (R.pp. 37-61). The ALJ thereafter denied Plaintiff's claim in a decision issued September 22, 2014. (R.pp.



23-31). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-4).[1]

Plaintiff then filed this action in United States District Court. Plaintiff asserts that the ALJ's decision is not supported by substantial evidence, and that the Commissioner's decision should therefore be reversed and remanded for further proceedings. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

## Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct**

---

[1] It is noted that Plaintiff filed a prior application for disability insurance benefits (DIB) on December 5, 2008, which was initially denied that same day. The ALJ found that good cause did not exist to reopen that case, and thus that previous determination remained final, binding, and not subject to further review. Plaintiff also filed a previous application for SSI on December 5, 2008, which was initially denied on March 10, 2009. With respect to that application, the ALJ found that, because Plaintiff did not file her current application within two years of that previous initial determination, that that previous determination also remained final, binding, and not subject to further review. (R.p. 23). Plaintiff has not challenged either of these findings.

2

> a verdict were the case before a jury, then there is "substantial evidence." [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also, Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)[Noting that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a *de novo* judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

### Medical Records

Plaintiff's medical records show that on January 13, 2009, she was examined by Dr. Brandon Fites of Sumter Orthopaedic Associates for complaints of right knee pain that had lasted for several years. Examination revealed some tenderness laterally, and an x-ray indicated some moderate degenerative changes. An injection was administered and surgery (replacement or arthroscopy) was discussed. (R.pp. 386-387). On March 3, 2009, Plaintiff reported that the injection had not helped, and Dr. Fites encouraged her to wait until she was at least fifty years old to get a knee replacement. (R.pp. 384-385).[2]

Plaintiff has also been treated by Dr. William Aldrich, of Cypress Family Medicine, since approximately 1997. (See R.p. 358). In June and December 2011, Plaintiff complained to Dr. Aldrich about right knee pain, and injections were administered. (R.pp. 270-272).

---

[2]Plaintiff was 47 years old at that time. (R.p. 30).

3

Plaintiff underwent a consultative examination (at the request of the state agency) with Dr. Brian Lecher on June 29, 2012 (approximately three months after her alleged onset date). She reported she had experienced knee, foot, shoulder, and elbow pain since 2009. Examination revealed that Plaintiff had full range of motion in all joints except for her knees, and that she had significant ligament laxity in her right knee with crepitus and diminished range of motion. Plaintiff's gait was slow and unsteady, she appeared uncomfortable, and she had difficulty squatting. X-rays of her right knee showed severe osteoarthritic changes with destruction of the normal joint space, osteoarthritic lipping, and joint mice (loose fragments of cartilage or cartilage and bone) bone-on-bone on that knee. Dr. Lecher assessed Plaintiff with severe right knee pain secondary to advanced osteoarthritis. He also opined that Plaintiff's complaints were consistent with arthritis in other joints, but noted no obvious external symptoms. Additionally, Dr. Lecher opined that finding employment would be difficult for Plaintiff. (R.pp. 281-283).

On August 9, 2012, state agency physician Dr. James Weston opined after a review of Plaintiff's records that Plaintiff could perform light work[3], limited to occasional pushing and /or pulling with her lower extremities; occasional use of foot pedals; occasional climbing of ramps/stairs, climbing of ladders/ropes scaffolds, balancing, stooping, kneeling, crouching, and crawling; and avoidance of concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (R.pp. 68-70).

---

[3]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

4



Plaintiff was treated at Black River Healthcare on September 5, 2012, where she reported that she suffered from diabetes, hypertension, asthma, and osteoarthritis. Plaintiff was assessed with hypertension (for which medication was prescribed) and suspected gout, but was denied narcotic medications and steroids until records could be obtained from her previous provider. (R.p. 288). Thereafter, on October 8, 2012, Plaintiff complained to Dr. Aldrich of continued knee pain and respiratory discomfort. Lortab was prescribed on October 17, 2012. (R.p. 986).

Plaintiff was treated at Clarendon Memorial Hospital on November 9, 2012, for pain and swelling in her left foot. On examination Plaintiff was wheezing and her ankle had some mild swelling, but her range of motion was intact and she had no erythema. An x-ray of her left foot showed soft tissue swelling, but no fracture. Lortab, Celebrex, and Keflex were prescribed, and she was assessed with arthritis, pharyngitis, and asthma. (R.pp. 343-351). Plaintiff returned to Clarendon Memorial on November 12, 2012 with complaints of shortness of breath, coughing, and wheezing. Examination indicated she was in moderate distress and had wheezing and rhonchi. Diagnoses included acute bronchitis and asthma. (R.pp. 330-341). Albuterol and Troponin were administered at Clarendon Memorial on November 20, 2012. (R.pp. 317-318).

Plaintiff was admitted to Clarendon Memorial from November 22 to 24, 2012, when she was treated for exacerbation of her asthma and uncontrolled diabetes. Hypertension and arthritis were also diagnosed. (R.pp. 362-363). Plaintiff returned to Clarendon Memorial for respiratory issues in November and January 2013, and was diagnosed with COPD. (R.pp. 293-315). A chest x-ray on January 13, 2013, showed she had mild cardiomegaly. (R.p. 292). At a follow-up visit on January 16, 2013, Dr. Aldrich noted that Plaintiff's lungs had wheezes, crackles, rhonchi, and



diminished breath sounds; she had chronic pain with joint pain in her right knee; and she was depressed with a flat affect. Lortab was prescribed. (R.p. 985).

On January 29, 2013, state agency physician Dr. Michele Spero opined after review of Plaintiff's records that she could perform light work, although she was limited as to her pushing and/or pulling with her lower extremities, that she could only occasionally use foot pedals, and was limited to only occasional postural activities. Dr. Spero also opined that Plaintiff needed to avoid concentrated exposure to extreme cold, heat, humidity, fumes, odors, dusts, gases, and poor ventilation. (R.pp. 79-81).

On March 6, 2013, Dr. Aldrich saw Plaintiff for complaints of trouble breathing. Dr. Aldrich noted that Plaintiff was hospitalized once a year and had at least four asthma attacks a year, and that she was anxious. He assessed arthritis flare and edema. (R.p. 984).

Plaintiff returned to Clarendon Memorial on May 11, 2013 for treatment of leg pain resulting from a slip and fall accident. An x-ray of her left femur was negative for fracture, but images of her left hip showed a slight cortical irregularity with possible non-displaced fracture. A CT of her lumbar spine showed spondylosis at T12-L1 and L1-2. She was prescribed crutches and Ultram for pain. (R.pp. 388-389, 783-807).

On May 14, 2013, Plaintiff complained to Dr. Aldrich about hip pain, left leg pain, and right knee pain. He assessed a contusion of her left thigh, stable asthma, chronic right knee pain, and diabetes. (R.p. 983). At Clarendon Memorial on June 6, 2013, Plaintiff reported that her pain had not improved. She was assessed with left leg pain, left hip and knee strain, and lower back pain/lumbar radiculopathy, and was directed to follow up with Dr. Aldrich. (R.pp. 754-771). On June 12, 2013, Dr. Aldrich noted Plaintiff's complaints of back and muscle pain and decided to obtain



a lumbar spine MRI. (R.p. 982). On June 24, 2013, Plaintiff's lumbar spine MRI was interpreted by the radiologist as showing a focal disc protrusion at L5-S1 abutting the S1 nerve root without significant displacement or pressure effect, multi-level thoracic and lumbar spondylosis, and degenerative disc disease (DDD) without focal herniation of spinal stenosis at L1-2. (R.pp. 394-395).

Plaintiff was treated at Clarendon Memorial for left foot swelling on July 7, 2013. X-rays revealed extensive soft tissue swelling in her ankle, but no fracture. (R.pp. 821-843). X-rays of Plaintiff's left shoulder showed progression of degenerative changes with possible rotator cuff pathology on July 24, 2013. (R.pp. 392-393). That same date, Plaintiff complained to Dr. Aldrich of right knee pain with swelling, foot pain, and pain in her neck and shoulder. Plaintiff was referred to Dr. Paul DeHoll (Sumter Orthopaedic). (R.p. 981).

On August 8, 2013, Plaintiff was treated by Physician's Assistant Thomas B. Eppley at Sumter Orthopaedic Associates for neck and back pain. Examination revealed tenderness in her paraspinal muscles, decreased range of motion in all planes, normal strength and reflexes, and negative straight leg raising. Plaintiff was unable to perform heel toe walking due to complaints of pain, and she had tenderness in her paraspinal and right trapezius muscles. It was noted that Plaintiff used a cane for assistance, and PA Epperly's suggested treatment included activity modification, anti-inflammatory medications, physical therapy and cortisone injections, and surgery. Plaintiff elected for Prednisone treatment, and was to return after obtaining a cervical MRI. (R.pp. 381-383). On September 15, 2013, a cervical MRI showed C4-5 central disc protrusion migrating superiorly, mildly compressing her spinal cord. (R.p. 903).

At Sumter Orthopaedics on November 4, 2013, Plaintiff reported no change in her symptoms. Examination findings also remained the same. PA Eppley's suggested treatment



included non-operative options as well as a possible anterior cervical diskectomy and fusion at C4-5. Although PA Eppley said that Plaintiff had a decision to make concerning surgery for her lumbar herniation and cervical herniation, he noted that this was complicated by Plaintiff not having insurance. (R.pp. 378-380).

Plaintiff was examined by Dr. DeHoll at Sumter Orthopaedic Associates on January 28, 2014, for complaints of neck pain with radiation into her right arm and hand, numbness and tingling radiating in the C6 distribution, and back pain with intermittent left and right leg pain. Examination revealed tenderness to palpation about the midline, paraspinal muscles, and right trapezius muscles; tingling sensation on the right at C5, C6, and C7; pain with extension of her knee; 5/5 (full) strength; normal sensation; equivocal straight leg raising; and normal heel and toe walking. Dr. DeHoll assessed Plaintiff with neck pain, lumbar DDD, lumbar herniated/bulging disc, cervical disc displacement, and cervical spine DDD. (R.pp. 376-377).

On February 14, 2014, Dr. DeHoll noted that Plaintiff's back had tenderness to palpation about the midline and the paraspinal muscles, pain with extension, normal sensation and reflexes, and equivocal straight leg raise. Dr. DeHoll interpreted Plaintiff's lumbar MRI as showing disc space collapse and anterior disc osteophyte complex at L1-L2, and a wide paracentral left-sided disc extrusion at L5-S1 that appeared to be encroaching on the exiting nerve root. Examination of Plaintiff's neck revealed tenderness about the mid line, the right paraspinal muscles, and the right trapezius muscles; normal range of motion; normal strength; and tingling on the right at C5, C6, and C7. Dr. DeHoll interpreted Plaintiff's cervical MRI as showing a moderate-sized central disc herniation that extended superiorly in the canal space that was in contact with the spinal cord and might be causing mild compression of the spinal cord at C4-C5. Non-operative and operative

8



treatments were discussed, including anterior cervical diskectomy and fusion at C4-C5. (R.pp. 373-374).

On February 18, 2014, Plaintiff was transported by ambulance to Clarendon Memorial for treatment after a seizure-like event the night before. A CT of her head showed a partially calcified meningioma. Plaintiff was diagnosed with abnormal leg movement, hyperglycemia, and a urinary tract infection. (R.pp. 886, 871-882). Dr. Aldrich noted that Plaintiff's blood sugar was 254 and blood pressure was 180/100, her reflexes were normal, there were no appreciable sensory deficits, and she had a normal gait. She was referred to a neurosurgeon to evaluate her meningioma with confusion as well as her leg numbness. (R.pp. 976-978).

Dr. Sunil Patel at the MUSC Neurology Clinic examined Plaintiff on March 1, 2014, at which time Plaintiff reported her seizure-like episode a few weeks prior involving her left leg and arm. Plaintiff reported that her episodes were not as frequent or severe after taking Klonopin. Dr. Patel thought that Plaintiff's mass in her right posterior frontal lobe was likely the cause of her seizures, prescribed Keppra, and recommended a craniotomy and resection of her tumor. (R.pp. 913-915).

On April 7, 2014, Plaintiff was evaluated at the Clarendon Mental Health Clinic for anxiety, which she reported was primarily related to finances and a seizure disorder, and she was reported poor memory, easy distractability, poor sleep, variable appetite, and some crying spells, and she was assessed with anxiety and prescribed Klonopin. Plaintiff also reported she had run out of Keppra two days prior and was unable to afford a refill. (R.pp. 918-919). Plaintiff then returned to Clarendon Mental Health on June 2, 2014, at which time she reported problems including intermittent confusion and expressive aphasia that was thought to be due to her tumor. She thought that Klonopin



9

had been helpful, but continued to report sadness, crying spells, anxiety, and insomnia. (R.pp. 920-922).

Dr. Aldrich noted on July 30, 2014 that Plaintiff's blood pressure needed to be stabilized before she could undergo meningioma removal surgery, and he changed her medications. (R.pp. 973-975). On August 21, 2014, Dr. Patel noted that he did not think Plaintiff's small meningioma was the source of Plaintiff's worsening headaches, and similarly advised that Plaintiff needed to get her blood pressure under control before surgery could be scheduled. (R.pp. 998-999). At the hearing before the ALJ, Plaintiff testified that her brain surgery had been scheduled for later that month. (R.p. 54).

## Discussion

Plaintiff was fifty years old at the time of her alleged onset date and fifty-three years old at the time of the ALJ's decision, she has a high school education (certificate), and past relevant work as a janitor. (R.pp. 30, 53, 203). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that she has an impairment or combination of impairments which prevent her from engaging in all substantial gainful activity for which she is qualified by her age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months. After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[4] of lumbar DDD, cervical DDD, osteoarthritis, and COPD (R.p. 25), she nevertheless retained the residual functional capacity (RFC) to perform light work limited to only

---

[4]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

10



occasionally using her feet for foot pedals; occasionally pushing or pulling with her bilateral lower extremities; occasionally climbing, balancing, stooping, kneeling, crouching, and crawling; avoidance of concentrated exposure to pulmonary irritants, temperature extremes, and humidity; and the need to have a cane available for ambulation at her discretion. (R.p. 27). At step four, the ALJ found that Plaintiff could not perform her past relevant work with these limitations. (R.p. 30). However, the ALJ obtained testimony from a vocational expert (VE) and found at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy with these limitations, and was therefore not disabled during the period at issue. (R.pp. 30-31).

Plaintiff asserts that in reaching this decision the ALJ erred by failing to properly assess the combined effect of her multiple impairments, that the ALJ's RFC analysis is not supported by substantial evidence, that the ALJ's credibility analysis is not supported by substantial evidence, and that the ALJ improperly discounted the opinion of Plaintiff's treating physician, Dr. Aldrich. After careful review and consideration of the arguments presented, the undersigned is constrained to agree with the Plaintiff that the ALJ failed to properly evaluate the opinion of Dr. Aldrich, thereby requiring a reversal of the decision with remand for further consideration of Plaintiff's claim.

A treating physician's opinion is ordinarily entitled to great weight, see Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996)[Noting importance of treating physician opinion]; is entitled to deference, and must be weighed using all of the factors provided for in 20 C.F.R. §§ 404.1527 and 416.927. See SSR 96-2p.[5] Under these regulations, a treating source's opinion on

---

[5]The undersigned notes that for claims filed *after* March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior
(continued...)



11

the nature and severity of an impairment is entitled to "controlling weight" where it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. Further, the ALJ is required to provide an explanation in the decision for what weight is given a treating source's opinion and, if rejected, why it was rejected. See 20 C.F.R. § § 404.1527(c)(2) and 416.927(c)(2).

Here, in addition to Dr. Aldrich's medical records that were before the ALJ, Dr. Aldrich completed a medical source statement on March 19, 2013, discussing how he had treated Plaintiff three to four times a year for sixteen years for asthma, uncontrolled diabetes, and severe osteoarthritis of her knee. He opined that Plaintiff suffered from shortness of breath, chest tightness, wheezing, edema, and episodic acute asthma; had asthma attacks four times a year; was incapacitated for an average of two days during her asthma attacks; and had anxiety that contributed to her symptoms and functional limitations. Dr. Aldrich estimated that Plaintiff could walk no city blocks without rest or severe pain; could sit for only thirty minutes at a time, stand for only thirty minutes at a time, and sit for less than two hours and stand/walk for less than two hours in an eight-hour work day; that she would need normal breaks; but would also sometimes need to take unscheduled breaks during the work day due to unpredictable asthma. He further opined that Plaintiff could rarely lift less than ten pounds and never lift more than ten pounds; that she could not twist, stoop, crouch/squat, climb ladders, and climb stairs; should avoid all exposure to environmental irritants; would likely be off task for twenty-five percent or more of the workday due to her symptoms being

---

⁵(...continued)
administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 416.920c. However, since the claim in the present case was filed before March 27, 2017, Plaintiff's claim has been analyzed pursuant to the treating physician rule in place at that time, as set out above.

12



severe enough to interfere with the attention and concentration needed to perform even simple work tasks; was incapable of even low stress jobs; and could not sit or stand for long periods of time. Moreover, it appears that on November 13, 2013, Dr. Aldrich updated his opinion to indicate that Plaintiff would likely miss an average of four days of work per month as a result of her impairments or treatment. (R.pp. 358-361).

The ALJ noted Dr. Aldrich's opinion but stated that she gave it "little weight" because it was inconsistent with the record as a whole and appeared to be based primarily on Plaintiff's subjective complaints. (R.p. 29). However, the ALJ provides no discussion or analysis of how or why this opinion is inconsistent with the record or how it was based primarily on Plaintiff's subjective complaints to support this finding. See 20 C.F.R. §§ 404.1527(e)(2) and 416.927(c)(2)[ALJ required to explain reasons for rejecting a treating physician opinion]. Indeed, other than the one paragraph in which the ALJ briefly recited part of Dr. Aldrich's opinion and then stated that she was giving it little weight, the ALJ did not mention Dr. Aldrich at all. Instead, the ALJ generally referred to his treatment notes along those of other providers while making general statements concerning Plaintiff's impairments. In particular, the ALJ found that Plaintiff's COPD, diabetes, GERD, and hypertension were well controlled with medication during the time period in question; stated that Plaintiff did not begin complaining of significant pain and swelling until she fell in May 2013[6] and injured her knee and hip; and found that even though Plaintiff used a cane and had a slow gait, there was no other evidence that she had difficulty standing or walking for extended periods of time while her coordination was within normal limits. However, contrary to these

---

[6] Notably, this was well *after* the opinions of Dr. Weston and Dr. Spero, to which the ALJ afforded "significant" and "great" weight, respectively, in reaching her decision. See discussion, infra.



13

statements and findings by the ALJ, Plaintiff's medical records show that she complained to Dr. Lecher in June 2012 of moderate to severe symptoms including knee, foot, shoulder, and elbow pain, and that she complained to Dr. Aldrich in October 2012 of knee pain for which narcotic medication (Lortab) was prescribed (R.p. 986). Additionally, there are numerous references in Plaintiff's medical records to her blood pressure and blood sugar being elevated despite her compliance with medication. (See, e.g., R.p. 282 - blood pressure 188/97; p. 297 - blood pressure 172/106, 189/106, and 158/104; p. 366 - blood sugar 339; p. 378 - blood pressure 172/90; 381 - blood pressure 196/111; p. 973 - blood pressure 180/110 to 198/127; p. 976 - blood pressure 180/100 and blood sugar 254; p. 980 blood pressure 144/96, blood sugar 236; p. 982 - blood pressure 150/96 and blood sugar 225; and p. 985 - blood pressure 162/100 and blood sugar 213).

The Commissioner argues that the ALJ was not bound by Dr. Aldrich's opinion indicating that Plaintiff was unable to work because determining a Plaintiff's RFC or whether she is disabled is an issue reserved to the Commissioner. However, although the ultimate determination of whether an individual is "disabled" or "unable to work" is a decision reserved to the Commissioner; see Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994) [physician opinion that a claimant is totally disabled "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]"]; 20 C.F.R. § 404.1527(d)[" A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled."]; Dr. Aldrich's March 2013 opinion is nonetheless highly relevant since it concerns Plaintiff's limitations as determined by her treating physician as a result of her asthma, uncontrolled diabetes, severe osteoarthritis of her knee, and anxiety. (R.pp. 358-361). See Craig, 76 F.3fd at 589-590 [Nothing importance of treating physician



14

opinion]. Thus, even if the ALJ did discount Dr. Aldrich's opinion on whether Plaintiff was capable of gainful employment as being one reserved to the Commissioner (although there is no indication in the decision itself that that was a reason the ALJ did so), it would not otherwise be proper for the ALJ to discount the *medical findings* in the opinion merely because Dr. Aldrich also opined that these findings and resulting limitations rendered Plaintiff disabled.

The Commissioner also contends that Dr. Aldrich's opinion was inconsistent with substantial evidence in the record, arguing that there were unremarkable diagnostic and laboratory evaluations in the record; that there were examinations that showed Plaintiff had full range of motion, full strength and sensation, normal gait, the ability to heel and toe walk, and the ability to ambulate without an assistive device; and that Dr. Aldrich's "extreme" opinion was inconsistent with treatment notes indicating that Plaintiff's cervical range of motion was within normal limits, she had stable arthritis, no gross motor abnormalities or loss of strength/function, normal reflexes, and a normal gait. Commissioner's Brief, ECF No. 18 at 16. However, these arguments are only post hoc rationalizations for upholding the decision, since the ALJ did not herself provide any specific findings for why she was rejecting Dr. Aldrich's opinion. See Ellis v. Astrue, No. 07–3996, 2009 WL 578539, at * 8 (D.S.C. Mar. 5, 2009) [Rejecting post hoc rationale for ALJ's decision]; Nester v. Astrue, No. 08–2045, 2009 WL 349701, at * 2 (E.D. Feb. 12, 2009) [Noting that the Court "may not consider post hoc rationalizations but must evaluate only the reasons and conclusions offered by the ALJ."].

Moreover, the record contains evidence to the contrary; i.e., that Plaintiff had diminished range of motion; an unstable gait; and that she had in fact been *prescribed* crutches at one point, and used a cane regularly. (R.pp. 281-283, 381-383, 981, 983, 985). Dr. Aldrich's opinion is also supported in part by the findings of Dr. Lecher that Plaintiff had severe right knee pain secondary



15

to advanced osteoarthritis, and the suggestion by orthopaedist Dr. Fites in March 2009 that Plaintiff might consider knee replacement surgery but should wait until she was at least fifty years old for such surgery (R.pp. 282, 384-385). The ALJ herself noted that Plaintiff had an unsteady ambulation and used a cane, had a slow gait, and was unable to walk on her heels or toes (beginning in November 2013), even while finding that Plaintiff had the ability to perform light work that included being able to stand and/or walk for up to six hours a day. (R.p. 28). However, the ALJ's statement in her opinion that, other than the evidence relating to Plaintiff's slow gait and use of cane, there was "no . . . evidence that [Plaintiff] has difficulty standing or walking for extended periods of time" is directly contradicted by the evidence from Dr. Aldrich, Plaintiff's treating physician; c.f. (R.pp. 28, 358-361); as well as by the records of Dr. Lecher, who found that Plaintiff had an unsteady gait and limited knee motion, and that Plaintiff would have difficulty finding employment. (R.pp. 281-283).

Although, as noted above, a determination of whether an individual is "disabled" or "unable to work" is a decision reserved to the Commissioner, Dr. Lecher's June 2012 opinion that Plaintiff would have a hard time finding employment was based on her "severe right knee pain secondary to advanced osteoarthritic changes" as well as her "advanced pain" and complaints "consistent with arthritis in other joints, especially her elbows and wrists," all medical opinions relating to Plaintiff's medical condition. (R.pp. 282-283). Moreover, even though the ALJ references Dr. Lecher's findings on page 6 of her decision, she did not discuss Dr. Lecher's opinion as to the severity of Plaintiff's condition, set forth the weight (if any) given to this opinion, or indicate whether it was being accepted or rejected. (R.p. 28). See Cotter v. Harris, 642 F.2d 700 (3d Cir. 1981)[listing cases remanded because of failure to provide explanation or reason for rejecting or not addressing relevant probative evidence].



16

However, the ALJ did specifically give "great" weight to state agency physician Michele Spero's January 2013 opinion that Plaintiff could perform a range of light work, and "significant" weight to the August 2012 opinion of Dr. Weston that Plaintiff could perform a range of light work, even though both of these opinions were issued *prior* to Dr. Aldrich's assessment of Plaintiff's condition in March and November 2013 (and were therefore not part of the records review upon which their opinions were based). Further, even though Dr. Spero's opinion (which was dated January 29, 2013) was given a couple of weeks after Dr. Aldrich's January 16, 2013 assessment indicating that Plaintiff suffered from "chronic" musculoskeletal pain, there is no indication that Dr. Spero had a copy of Dr. Aldrich's opinion or considered it in reaching her conclusions (see R.pp. 73-81, listing evidence considered). Moreover, the opinions of Dr. Weston and Dr. Spero were also issued prior to medical records indicating a possible deterioration in Plaintiff's condition in May 2013, including x-ray and MRI evidence and further treatment notes from Plaintiff's treating orthopaedic practice.

Specifically, these state agency physicians did not have the June 2013 lumbar MRI, which a radiologist indicated showed multilevel thoracic and lumbar spondylosis, DDD without focal herniation or spinal stenosis at L1-2, and focal disc protrusion at L5-S1 central left paracentral abutting the S1 nerve root without significant displacement or pressure effect (R.pp. 394-395); July 2013 x-rays of Plaintiff's left shoulder, which the radiologist interpreted as showing progression of degenerative changes with possible rotator cuff pathology (R.pp. 392-393); the September 2013 cervical MRI that a radiologist interpreted as showing a C4-5 central disc protrusion migrating superiorly, mildly compressing her spinal cord (R.p. 903); suggestions by the orthopaedic PA in November 2013 that Plaintiff had a decision to make concerning surgery for her lumbar herniation



17

or her cervical herniation (R.pp. 378-379); and February 2014 interpretations of the MRIs by orthopaedic surgeon Dr. DeHoll that Plaintiff's lumbar MRI showed disc space collapse and anterior disc osteophyte complex at L1-L2 and a wide paracentral left-sided disc extrusion at L5-S1 that appeared to be encroaching on the exiting nerve root, his interpretation that Plaintiff's cervical spine MRI showed a moderate-sized central disc herniation that extended into the canal space that was in contact with the spinal cord and might be causing mild compression of the spinal cord at C4-C5, and his suggestion that Plaintiff should consider having an anterior cervical diskectomy and fusion at C4-C5. (R.pp. 373-374).

In sum, although the ALJ did generally state that she had considered the opinion evidence in accordance with the requirements of the applicable regulations and SSRs (see R.p. 27), the decision does not reflect a proper evaluation of Dr. Aldrich's treating physician opinion. Indeed, the ALJ never even states that Dr. Aldrich is a treating physician (or make a finding that he is not), nor does she ever specifically discuss any of his medical records, the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, or provide a cogent rationale for discounting his opinion as to the severity of Plaintiff's condition. See 20 C.F.R. § 404.1527(c)(2)(I), (ii). Therefore, a remand of this case for a proper review and evaluation of the opinion of treating physician Dr. Aldrich is required.

With respect to the remainder of Plaintiff's claims of error, the ALJ will be able to reconsider and re-evaluate the evidence in toto as part of the reconsideration of this claim. Hancock v. Barnhart, 206 F.Supp.2d 757, 763-764 (W.D.Va. 2002)[On remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted *de novo*].



## Conclusion

Based on the foregoing, and pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner with remand in Social Security actions under Sentence Four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be **reversed**, and that this case be **remanded** to the Commissioner for reevaluation of the evidence as set forth hereinabove, and for such further administrative action as may be necessary. See <u>Shalala v. Schaefer</u>, 509 U.S. 292 (1993).

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

August 31, 2017
Charleston, South Carolina



## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).



20